Livings et al. *v.* Wiler.

MARIETT LIVINGS *et al.*

*v.*

JOHN WILER.

1. FORGED INSTRUMENT — *subsequent adoption.* Although a party's name to an instrument be a forgery, yet he may so far approve and adopt it, as that it will be as binding upon him as though he had, in fact, originally executed it himself.

2. SAME — *what will constitute an adoption.* Where the holder of a note and mortgage, which are alleged by the party whose name appears to be signed to the instruments, to be forgeries, or to have been obtained by fraud, renders an itemized account to the latter, in which is a credit in his favor for the proceeds of the mortgage, showing a balance in the account in favor of the mortgagor, and the latter, with a knowledge of the existence of the note and mortgage, and of the credit in his favor in the account for the proceeds thereof, sued upon that account and recovered judgment; *Held,* that such an appropriation of the proceeds of the mortgage was a full approval and adoption of it, and made it as binding upon the mortgagor as if it had been originally executed by him, or had been fairly obtained in the first instance.

WRIT OF ERROR to the Superior Court of Chicago; the Hon. JOHN M. WILSON, Chief Justice, presiding.

This was a suit in chancery instituted in the court below, by John Wiler against Mariett Livings, Almon Fuller and Augustus Frisbie, for the foreclosure of a mortgage alleged to have

been executed by the defendant Livings to Frisbie, on the 10th of August, 1857, to secure her note of that date for $3,000, payable two years after date with interest at ten per cent., and assigned by Frisbie to Miller, and by Miller to the complainant.

The defendant Fuller claimed to have some interest in the property mortgaged. Mrs. Livings, who appeared, on the face of the instruments, to have executed them, set up in her answer to the bill, *first*, a denial of the execution of the note and mortgage; and, *second*, that if her signature was ever really signed thereto, in blank or otherwise, it was obtained by fraud, covin and misrepresentation, under the following circumstances: That she was but little skilled in business, and had but little knowledge of the forms of legal documents, and so was liable to be imposed upon by the giving of false names to documents presented to her for execution, and yet was compelled to rely on others to state the names and character of such documents. That Joy and Frisbie, at the date of the mortgage, and for a long time before then, had charge of the premises described in the mortgage, to let the same for her and to receive the rents thereon; said firm being composed of Hiram Joy and said Augustus Frisbie; that they, or one of them, frequently called on her to sign leases, receipts and vouchers concerning that business; that she, reposing great confidence in them, signed some papers without much inquiry when presented by them; always on the understanding that such papers were nothing more than such receipts, vouchers or leases respectively; that she may thus have signed some papers in blank, though she had no special recollection of having done so at any particular time; that none of the documents ever presented to her to be signed, were represented, or known to her, to be a note and mortgage, but the papers so presented were represented to her, and by her believed to be receipts, or like vouchers, or a lease; and that if her signature was ever affixed to the note and mortgage, when in blank or otherwise, such signature was obtained on the false pretense that such papers were merely a lease and a receipt or like vouchers as aforesaid, such as she had been in the habit

of signing on application of said Joy & Frisbie; that she did not owe the money, has no recollection of either the note or the mortgage, and would not knowingly have given either of them.

The mortgage, upon being produced in evidence, did not appear to have been personally acknowledged by Mrs. Livings, but there were appended to it two certificates of proof of its execution; the first, irregular and insufficient in form, made by Calvin D'Wolf, a justice of the peace of Cook county, dated August 15, 1857; the other, which appeared to be sufficient in form, by a notary public for Chicago, bearing date May 22, 1860; both purporting to have been made upon the oath of Hiram Joy, who subscribed the mortgage as a witness.

*Mrs. Ann Gould* testified on behalf of the complainant, that she had seen Mrs. Livings write her name several times, and was of opinion that her signatures to the note and mortgage, and to a paper which was shown the witness, bearing date June 6, 1860, were genuine.

The paper referred to, dated June 6th, 1860, was addressed to Aaron Miller, at that time the holder of the note and mortgage, and purported to be a request by the subscribers, Mrs. Livings, Frisbie and Joy & Frisbie, for an extension of the time of payment of said note to the 10th of August, then next following, when they would pay it, with interest at ten per cent., from August 10, 1858.

The complainant also produced the papers and proceedings in an action of assumpsit brought by Mariett Livings against said Joy & Frisbie, in the Superior Court of Chicago, in November, 1860, in which suit she recovered judgment by default, December 27, 1860, for $3,300.00, a plea interposed by Frisbie having been previously withdrawn. The damages were laid at $5,000 in the declaration, and in her account filed a much larger sum was claimed. The account was made up in part of a large number of cash items, commencing March 5, 1856, and running till October 31, 1860, the whole, in items, as given, amounted to $9,337.35, besides some large items

added without date. One of the items embraced in the former or itemized part of the account, was this:

" 1858, Dec. 9. To cash received on mortgage
on lot in Newberry's addition, ............ $2,895.00."

Execution was issued on said judgment, and levied on real estate, but returned without sale of such real estate.

The complainant also read two itemized accounts which had been delivered about Nov. 1, 1860, by the bookkeeper of Joy & Frisbie to Mrs. Livings, the itemized part of which accounts correspond with the itemized part of the accounts filed with the declaration of Mrs. Livings in her suit above mentioned; such items amounting to a charge of $9,337.35 in her favor, as against Joy & Frisbie, and to credit in her favor for $6,312.43.

The complainant also produced a check drawn by Aaron Miller, Dec. 8, 1858, payable to Joy & Frisbie, or bearer, for $2,895.00.

*Hiram Joy*, the subscribing witness aforesaid, being called by the defendants, testified in substance that he did not know of the mortgage until he heard from the bookkeeper of Joy & Frisbie, several years after its date, that Aaron Miller had called with such a document; that if he had known she was signing a mortgage for such amount, he would not have signed it as a witness, nor have permitted her to execute it without explaining it to her; that he did not know she was giving such mortgage; that he never explained it to her, and thinks she did not know of it; that he never knew anything about her getting the money; that he did not know of any dealings between her and Augustus Frisbie distinct from those between her and Joy & Frisbie; that he would have known the fact if there had been such dealings to the amount of $3,000; that she was not indebted to Frisbie at the date of the mortgage, he thought, and that she never received any consideration for the giving of the mortgage, so far as he knew.

He further testified that, from 1855 or 1856 up to 1860, Mrs. Livings deposited her moneys with Joy & Frisbie, and they collected her rents, and that the deposits, from August 10th, 1857, to November, 1860, amounted to $8,282.96; that during

that time he conducted her business generally, in reference to the execution of deeds and like papers, but that both he and Frisbie frequently went to her to have leases and vouchers signed; that he did not remember that he ever went before the justice of the peace who affixed a certificate to the mortgage, as above stated.

On cross-examination, he said that the notary who affixed his certificate of date May 22, 1860, came to his house with Miller, just at tea time; asked him if it was his name signed as a witness to the mortgage, and he said it looked like it; that the notary administered to him an oath, in the usual form, he supposed; that they said there was something in a certificate of D'Wolf on it informal, or something like that, and that was the reason they wanted a new one; that before then he did not know that he had signed the instrument as a witness, nor that D'Wolf had made a certificate on it, and that, at the same time, he did not know what instrument it was.

He denied that D'Wolf had sworn or examined him as a subscribing witness.

He said that, on examining the name Mariett Livings, affixed to the mortgage, it was better than her handwriting, but he could not say whose handwriting it was. He further said that Mrs. Livings had a building erected in the summer of 1857; that the cost of all the improvements on the lot was $4,416; that he assisted in looking after the building, during the erection of it; that Joy & Frisbie paid some of the bills, and he thought she paid some; that, at the same time, she deposited her moneys with Joy & Frisbie; that the cost of the lot was $550, one-quarter paid down, and the balance in one, two and three years; that there might have been some of the last part of it drawn from Joy & Frisbie, but not much, if any; that when the contracts were made for the improvements on this lot, she had the note of Joy & Frisbie for $1,400 or $1,500, and afterwards got $800 by mortgage of a lot she had on the West side, in Chicago, and had $600 from her father, and some more, a quite large amount, from her relatives, and that these moneys came into the hands of Joy & Frisbie at different

·times, and that he did not think a dollar of the money of Joy & Frisbie went into the improvement of the mortgaged premises.

He further said that he thought he delivered to Mrs. Livings, about November, 1860, the accounts above mentioned, and that he supposed one of the items, for $2,895, referred to the mortgage in question.

In reference to the suit brought by Mrs. Livings, he said it was commenced to confess judgment, to give her the first lien for what Joy & Frisbie owed her. Also, that in November or December, 1860, Joy & Frisbie made an assignment, and put the name of Mrs. Livings in the preferred class of creditors for $3,600 or $3,700.

On redirect examination, he said he did not know, at or about Dec. 9, 1858, of any money having been received by Joy & Frisbie for or on account of a mortgage on her lot in Newberry's addition; that she never requested the making of such mortgage; that he thinks she did not know of it; that she did not request the payment of interest on it (there being an indorsement on it under date of August 10, 1857, for one year's interest, specified likewise in one of the accounts); that he thought it was between October and November, 1860, when Mrs. Livings learned that any items referring to such mortgage entered into her account on the books of Joy & Frisbie, and that she then objected to them, said it was all wrong, cried and acted like a crazy woman; that he did not then remember that she had ever executed such a mortgage, nor could he, when, in 1860, he learned from Bond, his bookkeeper, that Aaron Miller had called with such a mortgage, though he would not have forgotten it if he had witnessed, knowing it to be a mortgage; that he had signed, without taking much notice, everything Frisbie had asked him to sign as a witness, and thus signed some documents in blank; that the suit of Mrs. Livings against Joy & Frisbie was commenced upon his suggestion, to give her the first lien; that it had been previously agreed that Joy & Frisbie should take up the mortgage in controversy, and that she was not to have anything to do with it;

that the judgment in favor of Joy & Frisbie was not confessed on the account rendered by Joy & Frisbie, as above, but was lumped off, and was not for as much as was due her, but for as much as Frisbie would allow; that the prospect for collecting the judgment was then good, but that finally nothing could be realized for Mrs. Livings, either under the judgment or under the assignment; that in March, 1860, when Mrs. Livings looked over her accounts with Joy & Frisbie, she did not look at the items, but only at the footings.

On recross-examination he said that he wanted to allow Mrs. Livings a judgment for $300 or $400 more than she recovered as above; that the check was filled up by Augustus Frisbie; that the books of Joy & Frisbie showed that the money was received, but nothing was said to him about it in the office, though he was always consulted about the business of Mrs. Livings; and that at his instance proceedings were instituted to collect the judgment from property alleged to have been conveyed by Frisbie to defraud his creditors.

*Jon. Bond,* defendants' witness, testified by deposition, that he was bookkeeper for Joy & Frisbie from April, 1856, until they made their assignment in December, 1860, and had occasion to know of the business of Mrs. Livings as it respected the renting of her houses and the management of her real estate; that such business was transacted chiefly by Hiram Joy; that in August, 1857, Mrs. Livings was not indebted to Frisbie in $3,000, or any like sum; that at about said date, and until November, 1860, Joy & Frisbie frequently received considerable sums of money from her; that he made with her one evening (in October, 1860), an examination of the account, taking the aggregate debits and credits, and there was a balance of over $3,000 in her favor; that he had no recollection of ever seeing the mortgage in question before this examination, and that the first he learned of it was from Miller, in 1860.

On cross-examination he said that Joy & Frisbie received rents for Mrs. Livings from three lots in West Chicago, renting for something less than $30 per lot per annum, which rents Joy collected, and which came in driblets, and also received rents

from her house on the lot in Newberry's addition, after such house was completed, which he thought was in 1858 or 1859; that Joy, with Mrs. Livings, made the contracts, and superintended the erection of the building; that before the building was erected Joy & Frisbie had $1,500 or $1,600 of the money of Mrs. Livings, including their note to her for over $1,400, given for money she had deposited with them at various times; that she deposited with no one else than Joy & Frisbie; that the money to pay for the building passed through their hands; that he had no recollection that they had to advance moneys for her; that he had never seen the note aforesaid, to the best of his recollection, until this examination, and that the accounts were those rendered to Mrs. Livings, as he had stated on direct examination.

On redirect examination, he said the attention of Mrs. Livings was never called or attracted to the credit of December 9, 1858, for $2,895, to the best of his knowledge, and that so far as he knew she had no opportunity of knowing thereof before November 1, 1860; that he did not recognize the signature to the mortgage as that of Mrs. Livings, and that his recollection (though indistinct) was that she did not write so good a hand, but he thought a smaller hand.

*Mrs. Jennie White*, defendant's witness, testified by deposition that she was present when Miller procured the signature of her mother (Mrs. Livings) to the extension paper, dated June 6, 1860; that he brought the paper to her, and told her if she would sign it it would release her; that two of the receipts on the lease aforesaid (which receipts Mrs. Gould testified were signed by Mrs. Livings) were signed by this witness, Mrs. White, and that the other of said receipts was signed by Mrs. Livings; that in her opinion the signatures to the note and mortgage were not in the handwriting of Mrs. Livings; that they were written finer and much better than she could write; that on the occasion of signing the extension paper as aforesaid, her mother said she did not sign the note and mortgage; also, that she had always seen her mother write, and considered herself acquainted with her handwriting.

On cross-examination she said she could not say in whose handwriting the signature to a lease, which was shown the witness, was, whether her mother's or her own, though it looked more like her own; that she saw the note and mortgage when Miller first brought them to her mother's house, either at the same time that the extension paper was signed (June 6, 1860), or before, about two years before her examination, which occurred June 16, 1862.

On redirect examination, she said that when Miller brought the note and mortgage as aforesaid, he asked Mrs. Livings if she signed them, and she said she did not.

*Calvin D' Wolf*, called by the defendants, testified in his deposition that he had seen Mrs. Livings write, though not many times, but the writing which he saw her write was coarser, heavier, and, as he thought, exhibited evidences of a poorer writer than the signatures to the note and mortgage.

On cross-examination he said that his opinion as to the signatures was founded upon knowledge of her handwriting obtained at an interview within the then last month, when, at his dictation, she wrote what would cover half a page of foolscap paper, the writing consisting of words combining the various letters of her name, and a part of it in the form of a letter with her name signed to it; which interview happened from Joy having spoken to D'Wolf in regard to the certificate made by the latter upon the mortgage, when Joy stated that she said she had never signed the mortgage, and asked the witness if he was willing to see her in regard to it, to which he consented.

He thought the signature to the lease resembled her writing on the occasion above stated, and also bore a greater resemblance to the signature to the mortgage; though the signature to the lease was written lighter and easier than the writing which he saw her write on that occasion.

He further said that he did not recollect making the certificate which was indorsed on the mortgage in his handwriting, and did not remember of Mr. Joy, or any other witness, being sworn when it was made.

*Rose Fullagar*, sworn for defendants, testified that in the early part of the spring of 1860 she was present when Miller asked Mrs. Livings to sign some paper, and said he could not do anything with Joy & Frisbie; that if she would sign it, it would release her, and he would have nothing further to do with her at all, then he could come on Joy & Frisbie. He said he would go and see them, and got up and went out.

On cross-examination the witness said she had known Mrs. Livings fifteen years, during which time the latter had carried on dress making, doing her own work for the last three or four years, but before then having one or two apprentices.

*William Cooper*, a grocer, with whom Mrs. Livings had dealt for 15 or 16 years, being examined for the defendants, testified that he had, from dealings with her, become acquainted with her handwriting, and that the signature to the note and mortgage did not look like any of her handwriting that he had ever seen, but was a better hand than he had ever seen her write.

On cross-examination he said that the writing of hers which he had seen was on the exchange of receipted bills between them, her bills for work and his bills for groceries; that the signature of the lease looked some like hers, though finer than anything he had seen of her writing; that it looked more like her writing than the signatures to the note and mortgage; that the L in the lease looked more like hers than the L in the mortgage; that he had not for four years seen the receipts which he had previously taken from her, but had seen some of her handwriting which she had exhibited to him after the commencement of this suit, which looked like the old signatures which he had seen before.

On being shown the extension paper, he said the signature thereto might be hers, though she usually wrote a coarser hand. He said the L in that signature resembled the L in the mortgage more than it did the L in the lease. He mentioned how the L had been made in signatures which he had known to be hers, and said that from what he had seen of her handwriting he did not think her signature to the note and mortgage genuine.

The court below decreed a foreclosure of the mortgage. Thereupon the defendants sued out this writ of error. Two questions are presented upon the record, *first,* whether, according to the testimony, Mrs. Livings executed the note and mortgage; and *second,* whether her subsequent action in relation to them, was an approval and adoption of those instruments, so far as to render her bound by them, even though they were forgeries.

Messrs. Arrington & Dent, for the plaintiffs in error.

Messrs. Farwell & Smith, for the defendant in error.

Mr. Chief Justice Caton delivered the opinion of the Court:

The principal question in this case, and the one to which we have directed most of our attention, is, whether the defendant executed the note and mortgage, or if she did not execute them, then had she so adopted them as to be bound by them. Most certainly, the testimony, when carefully and maturely considered, is of a very extraordinary character. The principal witness for the defense is placed in a very awkward position, to say the least. There is no doubt that his signature to the mortgage as a witness is genuine, and he admits that as such subscribing witness he once, at least, proved the execution of the mortgage before the notary public, and we have very little doubt that he had previously done the same thing before the justice of the peace. And yet he expresses the confident opinion that he never subscribed the mortgage as a witness, knowing that it was such mortgage. And, also, he thinks that the name of the defendant to the mortgage is not her signature. We hardly know what to make of such a witness. Either his simplicity is very great or his recklessness is very manifest. Either he is very confiding and very honest, or he is something quite the reverse. When produced in evidence, there was upon the mortgage the legal statutory proof of its due execution, and it was for the defendant to prove that it was not genuine. The evidence on this point is far from conclusive, or even satisfac-

tory.   The defendant was in the habit of writing but little, and manifestly, not enough to establish or acquire any marked characteristics to her signature, and in such cases it is most difficult to either prove or disprove the genuineness of a signature. Hence, as might be expected, most of the witnesses seem to be in doubt whether this is her signature or not, though a majority of them express the opinion that it is not.   If, however, the witnesses are in doubt, it is not remarkable that we, after examining all the testimony in the case with the most earnest solicitude, should be also laboring under the same embarrassment. Upon the evidence, the court below was of opinion that the mortgage was in truth executed by the defendant, and were we compelled to pass upon this question, we should hesitate long before reversing that decision.

But be that as it may, beyond all question, she has affirmed and adopted the mortgage as her own, and is to-day affirming and adopting it as her own, in legal effect.   Lay aside her signature to the paper asking to have the time for payment extended, as having been executed under a misapprehension as to its effect, and lay aside the long time that elapsed while the proceeds of the mortgage stood to her credit in the accounts rendered by Joy and Frisbie, her bankers, for the reason that she did not examine the items carefully, but looked only at the footing; lay aside even her permitting the proceeds of the mortgage to stand to her credit on the books of Joy & Frisbie, without objection, even after the first of November, 1860, when she, beyond doubt or question, knew all about it, as much as she does to-day; lay all these evidences of affirmance and adoption aside, we say, and still we have the insurmountable, the conclusive fact, that the defendant has received and appropriated the proceeds of this mortgage to her own use, just as much as if she had received the proceeds in gold, and placed it in her pocket; and that too, after she knew all about it, and even after she had denied and protested that it was not her mortgage, but was a forgery.   After she knew all this, and when she knew that the proceeds of the mortgage stood to her credit in her account against Joy & Frisbie, she sued them upon

that account, and obtained a judgment against them for this account thus including the proceeds of this mortgage. This was a complete and conclusive appropriation of the proceeds, and an adoption of the mortgage, as much as if she had personally received the cash and used it herself. Suppose a negotiable note had been received for the mortgage instead of the money, and she had accepted the note and put it in circulation, well knowing whence it came. Even this would have been as much an appropriation of the proceeds and an adoption of the mortgage as the receipt and use of the money. Or suppose she had sued, and obtained a judgment upon such a note. Should she succeed in this defense and defeat the mortgage, this judgment against Joy & Frisbie still remains in full force, and she may, and, indeed, the legal presumption is that she will collect it; then she will enjoy the proceeds of the mortgage and avoid its responsibilities. If this was a forgery, she has approved and adopted it, and is thereby as much bound by it as if she had originally executed it.

The decree is affirmed.

*Decree affirmed.*