CHARLES NORMAN FAY

*v.*

ARTHUR O. SLAUGHTER *et al.*

*Opinion filed December 18, 1901—Rehearing denied February 5, 1902.*

1. POWER OF ATTORNEY—*extent of authority given by power of attorney to endorse checks.* A power of attorney to endorse checks of the donor of the power for deposit in a certain bank, authorizes the endorsement of such checks as are the property of such donor but not those which are acquired by the donee of the power in an unauthorized manner.

2. PRINCIPAL AND AGENT—*when principal is not liable to third party for money embezzled by agent.* If a book-keeper forges his employer's name to certain shares of stock during his employer's absence and sells the same through brokers, who neglect to ascertain the genuineness of the endorsement, the fact that the book-keeper is enabled to embezzle the proceeds of the checks given in payment by reason of a power of attorney to endorse and draw checks during his employer's absence, (the existence of which power of attorney was unknown to the brokers,) does not render the employer liable to the brokers for the amount embezzled, where he disaffirmed the sale at once upon learning the facts.

3. SAME—*agent cannot ratify his own unauthorized acts.* An agent having authority to do lawful things cannot, by virtue of such authority, ratify his own unauthorized or illegal acts so as to bind his principal.

*Fay* v. *Slaughter*, 94 Ill. App. 111, reversed.

WRIT of ERROR to the Branch Appellate Court for the First District;—heard in that court on appeal from the Superior Court of Cook county; the Hon. FARLIN Q. BALL, Judge, presiding.

This action was assumpsit by the defendants in error against the plaintiff in error. The declaration consisted only of the common counts. The only one relied upon was that for money had and received, and the only plea was the general issue. At the close of the evidence the court gave a peremptory instruction directing a verdict for defendants in error for $28,912.08. A judgment upon this verdict was affirmed by the Appellate Court, which

had on a prior appeal decided in favor of defendants in error.   (80 Ill. App. 105.)

The evidence shows that in June, 1894, Fay was the owner of an installment receipt issued by the Chicago Edison Company, entitling him, on the payment of certain installments not yet due and a surrender of certificates, to two hundred shares of the capital stock of this company.  Fay, not being in active business, was absent from Chicago in the east from the 23d of June, 1894, until the 8th or 9th of October of that year.  This installment receipt was left by him in a tin box in his office vault, to which his stenographer and book-keeper, Charles E. Anderson, had access, but in which no other securities of Fay's were kept.  During his absence the installments under this receipt became due, and he instructed Anderson to make payments thereof.  When the last payment was made, Fay gave his brother-in-law, Mr. Wilmerding, an officer of the Edison company, a power of attorney to endorse the installment receipt, deliver it to the Edison company, and take in Fay's name regular stock certificates for two hundred shares of stock.  This Wilmerding did, and two stock certificates, each for one hundred shares, were issued in Fay's name and delivered to Anderson.  No further instructions or authority in respect to this stock were given by Fay.  On September 12, 1894, Anderson sent to Slaughter & Co. one of these certificates for one hundred shares of stock upon which he had forged Fay's name, and telephoned Mr. Baker, one of the defendants in error, that Fay wanted to sell some Edison stock, and asked what price could be got for it.  Baker reported that it was offered at $125 per share.  Anderson said he did not think Fay would sell at that price, but would wire him at his summer residence in the east and let Baker know.  The next day Anderson telephoned Baker that he might sell fifty or one hundred shares at the market price, and Slaughter & Co. then sold fifty shares at $123 a share.  Thereupon this one-hundred-share

certificate was sent by Slaughter & Co. to the Edison company's office and split into two new certificates, each for fifty shares, which were returned to Slaughter & Co., and they transferred one to the party to whom the fifty shares had been sold and retained the other. On the same day Slaughter & Co. sent Anderson a check, payable to Fay's order, for $6137.50, the proceeds of the sale less their commission. On September 14 Anderson again telephoned Slaughter & Co. to ascertain whether the remaining fifty shares had been sold, and upon being told by Baker that they had not and could not be for the same price, Anderson told Baker that Fay needed money, and asked him if they would loan $6000 on the fifty shares. Baker assented, and on September 14 sent Anderson a check, payable to Fay's order, for $6000. On September 25 Anderson again telephoned Slaughter & Co. that Fay needed more money and did not wish to sell the stock at the previous price, and asked if they could make another loan upon one hundred other shares of the same stock. Baker assented, and Anderson then sent over the certificate for the other one hundred shares of stock, upon which he had also forged Fay's name. This certificate Baker gave to one of their clerks, Thomas, who signed it as a witness to the genuineness of Fay's signature, without knowing or attempting to find out anything about the genuineness of the signature. Upon the receipt of this certificate Slaughter & Co. sent Anderson a check, payable to Fay's order, for $8000. On October 4 an additional loan of $2000 was made by Slaughter & Co. at the request of Anderson, and they sent by messenger a check for $2000, payable to Fay's order. The fifty-share certificate was by Slaughter & Co. exchanged for two twenty-five-share certificates, and one of these they, by Anderson's direction, sold on October 8, and the amount of the sale was applied by them in reduction of the previous loans. In none of these transactions did Slaughter & Co. personally meet Anderson. The sale and loans

were arranged by telephone and the checks were sent to Anderson by messenger.

When Fay left Chicago he executed to Anderson the following power of attorney, in the usual printed form furnished by the bank, nothing but the name of Anderson, the date and signature being inserted in writing:

"*Know all men by these presents,* That I do hereby make, constitute and appoint Charles E. Anderson to be my true and lawful attorney, for me and in my name to draw checks, bills of exchange and drafts and make orders and over-drafts upon the Northern Trust Company of Chicago, and in my name to endorse checks, drafts, bills of exchange, notes and orders for deposit in said Northern Trust Company, hereby confirming all that my said attorney shall do under above authority."

Under this power of attorney Anderson endorsed the above checks given him by Slaughter & Co. for deposit in Fay's name, and immediately deposited them in the Northern Trust Company, where Fay had kept his bank account. Under this same power of attorney Anderson, during Fay's absence, drew out of this bank account and appropriated to his own use amounts in excess of the amounts of these Slaughter & Co. checks, and also drew sundry checks against it in Fay's interest, including the checks to pay the amounts becoming due during Fay's absence under this installment certificate. Upon Fay's return to Chicago and discovery of the forgeries, on the 10th of October, the amount in such bank account was only $134.84. A copy of Fay's account with the Northern Trust Company shows that there was deposited in this account during this period enough of Fay's own money to pay all his legitimate checks and $1084.84 in addition; that is, Anderson had also embezzled $950 of Fay's money, the balance being only $134.84, instead of $1084.84, as it should have been. It is also shown that after August 10, and up to September 13, (the date of the deposit of the first Slaughter check,) Anderson had, by misuse of this power of attorney, embezzled from Fay's bank account $2775. It also appears that the total of Ander-

son's fraudulent checks, after the Slaughter money began
to go into Fay's bank account, was $1825 less than the
total amount of the Slaughter checks,—that is, the total
legitimate checks, or checks drawn for Fay's benefit,
exceeded his legitimate funds by $1825.    To that extent
Slaughter & Co.'s money went to re-pay the previous
embezzlements of Anderson from Fay's bank account.
Slaughter & Co. did not know of the existence of the
foregoing power of attorney.   Upon Fay's return to Chi-
cago Anderson was arrested and sentenced for larceny,
but escaped from a hospital where he had been trans-
ferred on the plea of sickness, and he has ever since
remained a fugitive.

On October 19, 1894, Fay filed a bill in the superior
court of Cook county against the Edison company to
secure his re-instatement as the holder of the two hun-
dred shares of stock transferred upon the forged endorse-
ments, and for the issuance of new shares to him in lieu
thereof.   In that suit Fay obtained a decree, and in ac-
cordance therewith new certificates were issued to him,
and the dividends which had in the meantime accrued on
the old stock were paid to him.   On appeal this was af-
firmed by the Appellate Court, (62 Ill. App. 55,) and sub-
sequently by this court. (164 Ill. 323).   After that decree,
Slaughter & Co., being advised that they were legally
liable to do so, voluntarily delivered to the Edison com-
pany two hundred shares in place of the certificates in
question, and also re-paid the Edison company the ac-
crued dividends upon such shares, with interest thereon,
and then instituted this suit to shift the loss upon Fay.

The evidence also shows that Fay was not engaged in
active business on his own account, and, while the presi-
dent of a corporation, gave very little personal attention
to its business; that he had no personal business except
taking care of his property, (including two buildings,)
collecting rents, paying taxes and ordinary expenses.
Anderson was his stenographer, clerk and book-keeper,

194—11

and his duties consisted in paying Fay's rents, paying building expenses and bills, making deposits, and, during the life of the power of attorney above set forth, endorsing checks for deposit and drawing checks upon Fay's bank account. He had no authority from Fay with reference to negotiating loans, Fay always negotiating his own·loans, and he had never obtained any through Slaughter & Co. Anderson had no access to or custody of Fay's negotiable securities, these being kept by Fay in a safety deposit vault to which Anderson had no access.

The reason that the Edison certificates in controversy were in Anderson's possession instead of the safety deposit vault was that Anderson had no access to the vault. Anderson was on one or two occasions with Fay when he went to the vault to get some securities, but was not allowed possession of the securities. Fay never intrusted Anderson with endorsed securities or bonds which would pass without endorsement, and never trusted Anderson with the delivery of any such securities to Slaughter & Co. when Fay was not present. Fay gave no instructions to Anderson respecting this Edison stock after its issue. Anderson had no other power of attorney than the one above set forth. His authority as agent for Fay was limited to such as arises, in law, from the giving of the above power of attorney and the employment by Fay of Anderson in the kind of service above indicated. The first notice that Fay had of this transaction was upon his return home from the east, October 8 or 9, 1894, when he found in his office a report from Slaughter & Co. of the sale of the last stock. He at once called upon Slaughter & Co. and repudiated the sale, informing them that Anderson had no authority to make it and that he had no stock for sale. It further appeared from the evidence that the custom prevailed at all the banks of Chicago for depositors to give powers of attorney to third persons to endorse checks and to draw checks upon the banks. The cashier of the First National Bank of Chicago testi-

fied that one in twelve depositors of that bank so conducted his business, and that from his knowledge of the checks of other banks of that city that passed through that bank, and the signatures of the customers, that custom also prevailed in all the other banks, but he could not state the percentage, and that the First National was one of the largest banks there.

At the close of the evidence plaintiff in error first requested the court to instruct the jury that Slaughter & Co. could not recover·at all, and this being refused, that they could not recover in excess of $1825. This the court also refused to do, and in lieu thereof gave a peremptory instruction in favor of the defendants in error, as above stated.

The errors relied upon are: First, that the court erred in giving the peremptory instruction directing a verdict for defendants in error; second, that the court erred in not directing a verdict for plaintiff in error; third, that the court erred in not limiting the verdict for defendants in error to $1825, as requested by plaintiff in error; fourth, that the court erred in allowing defendants in error to recover interest.

HENRY S. ROBBINS, and HOLT, WHEELER & SIDLEY, for plaintiff in error.

WILLIAM H. SWIFT, and ULLMANN & HACKER, for defendants in error.

Mr. JUSTICE RICKS delivered the opinion of the court:

This is an action upon the common counts for money had and received. It is in the nature of an equitable proceeding at law. "The principle governing in such case is, that the possession of money has been obtained which cannot conscientiously be withheld. Such an action is designed for the advancement of justice, and it is applicable where a person receives money which in equity and

good conscience he ought to refund. The defense to the claim, as well as the claim itself, is governed by the same principles. In speaking of this action, Lord Mansfield, in *Moses* v. *McFarland*, 2 Burr. 1010, said: 'It is the most favorable way in which he can be sued. He can be liable no further than the money he has received, and against that may go into every equitable defense upon the general issue. He may claim every equitable allowance, etc. In short, he may defend himself by everything which shows that the plaintiff, *ex æquo et bono*, is not entitled to the whole of his demand, or any part of it.'" *Board of Supervisors of Stephenson County* v. *Manny*, 56 Ill. 160.

A peremptory instruction was given at the close of all the evidence directing a verdict for defendants in error, plaintiffs below, and the question presented is, whether, under the foregoing statement of facts, the action of the Appellate Court in approving the giving of this instruction can be sustained.

The undisputed evidence is, that between September 13 and October 4, 1894, Charles E. Anderson, pretending to act as agent for plaintiff in error, received from defendants in error four checks on the Merchant's National Bank of Chicago, aggregating $22,137.50, written to the plaintiff in error, for two certificates of stock of the Chicago Edison Company, each for one hundred shares, the property of plaintiff in error, which could only be sold or disposed of by plaintiff in error's endorsement; that Anderson forged this endorsement; that he neither had authority to sell the stock nor endorse plaintiff in error's name thereon; that plaintiff in error was absent from the city of Chicago from June to October 8 or 9 of that year, and that he had no actual knowledge of the transaction until his return, when he repudiated it; that Anderson was the clerk and book-keeper of plaintiff in error, having authority to collect rents from certain real estate owned by plaintiff in error in Chicago, which was verbal, and that he also had a power of attorney, made by plain-

tiff in error shortly before going away, by which he was authorized to draw checks, bills of exchange and drafts and make orders and over-drafts upon the Northern Trust Company of Chicago, and endorse checks, drafts, bills of exchange, notes or orders for deposit in such Northern Trust Company; that Anderson did endorse the four checks received from defendants in error and did deposit the same to the account of the plaintiff in error with the Northern Trust Company, and did draw all that money so deposited and $950 of plaintiff in error's, all of which he embezzled before the return of plaintiff in error and before he had any knowledge of the transaction.

It is not insisted by defendants in error that Anderson had any express authority to sell the stock and receive the checks in question, nor is it contended that there was anything in the conduct of Fay, or the previous course of dealing of Anderson with Fay's knowledge, from which any implied authority to do such acts could arise, but the contention on the part of defendants in error is, that although he had no authority to receive these checks or to sell the stock and sign the name of plaintiff in error to it, yet having authority to endorse checks for deposit to plaintiff in error's account in the particular bank where these checks were deposited, and having authority to draw checks on that account, plaintiff in error, by the act of Anderson in endorsing the checks and having the money placed to his account, received the benefit of the money and is liable in this action.

Defendants in error had no knowledge of the existence of this power of attorney until long after this entire transaction, and did not deal, nor do they pretend to have dealt, with Anderson upon the faith of it. It is clear, therefore, that whatever they did was without reference to this power of attorney, and any authority given under it cannot be relied upon by them as a matter of estoppel against plaintiff in error. But they argue that plaintiff in error, having given Anderson power to endorse checks,

and he having exercised that power and endorsed the checks in question and placed the money to the credit of plaintiff in error, plaintiff in error by that act became chargeable with the money. Upon what theory of law could plaintiff in error become liable for this money? We think of but two: First, by having knowledge of the transaction and ratifying it; second, by receiving the benefits of the transaction, the legal effect of which must be to raise, by implication, a ratification.

It is not insisted that plaintiff in error expressly ratified the acts of Anderson, nor is it contended that he actually received the benefits of this money, but it is said that by giving Anderson the power to endorse checks for deposit, that power carried with it the implied power, at least, to ratify the transaction and to bind plaintiff in error. Let us for a moment see what power Anderson did have. As has been stated, he was the agent of plaintiff in error to receive rents, and as clerk of plaintiff in error he would be authorized to receive whatever checks or moneys plaintiff in error gave him or authorized any other person to give him. In other words, he was authorized to receive checks belonging to plaintiff in error, and checks so belonging to plaintiff in error and so received by Anderson he had written authority to endorse for deposit, only, to the credit of plaintiff in error. To get these checks he made an unauthorized sale of plaintiff in error's property, and in order to effect that sale committed forgery. Such being the manner and circumstances under which he received these checks, can we say, as a matter of law or fact, that they were the checks of plaintiff in error or that Anderson had any right to receive them for him? By the laws of England and several of the States plaintiff in error could not have ratified a transaction growing out of a forgery. (1 Am. & Eng. Ency. of Law,—2d ed.—p. 1185; *Henry* v. *Heeb,* 114 Ind. 275; *Brook* v. *Hook,* 24 L. T. 34.) In the case at bar there was no pretended authority to act for Fay. The pretense

was that Fay was acting for himself and to that end had assigned the stock, and that Anderson was acting merely as the messenger or spokesman of Fay in the transaction. He did not pretend that he had authority to sign Fay's name or that he was agent to make the sale, but did pretend that Fay had signed his own name and personally directed the sale, and the above authorities are to the effect that when a forgery is committed there can be no pretense of authority, and, as is said in *Henry* v. *Heeb*, *supra*: "It is difficult to understand how one who is, in a sense, the victim of the criminal act, may adopt or ratify it." By the decisions of this State he might do so, but he would only be held to do so when it was shown that with a full knowledge of all the material facts he did ratify it. *Livings* v. *Wiler*, 32 Ill. 387; *Hefner* v. *Vandolah*, 57 id. 520; *Chicago Edison Co.* v. *Fay*, 164 id. 323.

The evidence shows that eight per cent of the depositors of the First National Bank of Chicago,—which is one of the largest in that city,—and a considerable per cent of the depositors of all the leading banks in Chicago, gave to third parties powers of attorney to endorse and draw checks. It further shows that up to the time this transaction was disclosed to plaintiff in error he never had any reason to suspect that Anderson was dishonest. It cannot, therefore, be said that the exercise of a rule of business that so largely obtained in that locality was negligence. Nor was it unlawful for plaintiff in error to have given Anderson the power he did give him. But, without expressly saying so, the argument of defendants in error proceeds upon the theory that by reason of that power of attorney Anderson was enabled to do an act which was equivalent, in law, to the ratification by plaintiff in error of Anderson's own criminal act. Until plaintiff in error did ratify Anderson's acts these checks were not the property of plaintiff in error, and Anderson had no legal authority to receive them for or on behalf of plaintiff in error. The necessary implication of law

would be that the authority given to Anderson under the power to endorse checks for deposit to plaintiff in error's account would be to endorse plaintiff in error's checks; that is, checks that were the property of plaintiff in error,—not the checks of strangers to plaintiff in error's business, or checks that Anderson might in any unauthorized manner acquire, but such checks as we would presume plaintiff in error would himself endorse. An action for money had and received will lie against one who receives stolen money from the thief. (*Hindmarch* v. *Hoffman*, 127 Pa. 284.) Suppose these checks, drawn as they were, had been stolen by Anderson from the drawers and thus endorsed and passed through the account of plaintiff in error and the money checked out and stolen by Anderson before plaintiff in error had any knowledge of the theft; would they, in that case, be the property of plaintiff in error, and would Anderson be acting for plaintiff in error any more than if he had gone and stolen a like sum of money and put it in plaintiff in error's money box and again stolen it out without the knowledge of plaintiff in error? And in either of those cases, would an action lie against plaintiff in error for that money on the theory that plaintiff in error had received it? Anderson having authority to do certain lawful things, could not, by virtue of that authority, ratify his own unauthorized and illegal acts so as to bind his principal. (*Hotchin* v. *Kent*, 8 Mich. 526; *Trudo* v. *Anderson*, 10 id. 357; Am. & Eng. Ency. of Law,—2d ed.—p. 1183.) Having no authority to receive the checks in question, they being the fruits of his crime, he would not, by the exercise of his legal authority to endorse checks, ratify this transaction. In *Trudo* v. *Anderson, supra*, the court says (p. 367): "An agent cannot ratify an act done by himself or his servant beyond the scope of the agency, so as to bind the principal; otherwise an agent might enlarge his own powers to any extent, without his principal's consent."

Defendants in error were bound to know that the signature to the assignment of the stock was genuine. They dealt with Anderson, so far as he entered into it at all, at their peril, and having been guilty of the first wrong in accepting the forged assignment of these stocks, it being their duty to have verified the signature of plaintiff in error before doing so, and having placed it within the power of Anderson to have perpetrated a fraud and injury upon both plaintiff in error and defendants in error, the defendants in error are not in a condition to say that both parties were equally at fault. As against plaintiff in error they were guilty of a wrong when they received from Anderson plaintiff in error's property upon this forged endorsement, and we are unable to see wherein plaintiff in error was guilty of any wrong. He at no time or place trusted Anderson with this property in a manner that could have enabled him, except by the forgery, to have disposed of it. What act of plaintiff in error, then, can be said to have been a ratification of this transaction? We do not regard it enough that the money should have simply gone into his account, under the circumstances shown in this case. In the absence of express ratification, leaving aside the equitable view of it, he could not be deemed, in law, by implication, to have ratified the acts of Anderson unless with a knowledge of its source, and the material facts relating to the manner in which it came into his bank account were brought home to him, and then, with that knowledge, appropriated the money, or part of it, to his use. *Hotchin* v. *Kent, supra; Pope* v. *Lowitz,* 14 Ill. App. 96; *Mathews* v. *Hamilton,* 23 Ill. 416; *Proctor* v. *Tows,* 115 id. 138; 1 Am. & Eng. Ency. of Law, (2d ed.) p. 1196.

There are a number of well considered cases holding that it is not sufficient, to charge a principal, to show that money or property is by the unauthorized act of the agent brought into the principal's business and used, without the knowledge of the principal of its use or of

the unauthorized manner of getting it. (*Steam Navigation Co.* v. *Dandridge,* 8 G. & J. 248; 29 Am. Dec. 543; *Reese* v. *Medlock,* 27 Tex. 120; 84 Am. Dec. 611; *Hotchin* v. *Kent, supra; Bolent* v. *Oberne,* 36 Kan. 386; *Spooner* v. *Thompson,* 48 Vt. 259; *Thatcher* v. *Pray,* 113 Mass. 291; 18 Am. Rep. 480; *Pope* v. *Lowitz, supra.*) But as these cases, in this form of action, seem to proceed upon equitable ground, we have in the case of *First Nat. Bank of Las Vegas* v. *Oberne,* 121 Ill. 25, carried the rule so far as to hold that although the agent did not have authority to do the particular act by which the money was obtained, and although the principal did not know of the act or of the fact that the money had been used by his agent for his benefit, yet if the evidence showed that the principal, in his business, in fact got the benefit of the money, in whole or in part, he would be liable for such part as the evidence showed he did get the benefit of. We think that is carrying the rule as far as it ought to be carried. We are unable to concur in the view that the mere passing of this money through the bank account of plaintiff in error without authority given by him, and in the absence of evidence showing it went to his benefit or was used by or for him, can be held to be such receiving of the money of defendants in error by him as in equity and good conscience renders him liable for money had and received for the use of defendants in error. In this record there is no evidence showing, or tending to show, that plaintiff in error got the real benefit of any of this money, either by checking it out for his own use or by its being checked and applied to his business. There is evidence showing that before Anderson got any of the checks from Slaughter he had embezzled about $2700, and that his total embezzlements were all that he got from defendants in error and $950 of plaintiff in error's money, so that $1825 of defendants in error's money went toward balancing the $2700 embezzled by Anderson prior to the deposit of the first of plaintiff in error's checks, and in that manner went to the benefit of

Fay's business. As a matter of fact, the evidence shows that Fay himself, and from his own proper resources, deposited $1084.84 more than was checked out for his legitimate affairs, and that there was only $134.84 in the bank when he came home. However, we regard Fay's admission as sufficient to charge him with that amount, and no more.

Entertaining the views herein expressed, we think the trial court erred in instructing the jury to find a verdict for plaintiffs, and that the Appellate Court should not have affirmed that action. The judgments of the Branch Appellate Court for the First District and of the superior court of Cook county are reversed, and the cause is remanded to the superior court for any further proceedings in accordance with this opinion.

*Reversed and remanded.*